UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 10-10086-GAO |
| | ) | |
| DENIS TAYLOR | ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant Denis Taylor respectfully submits this memorandum
to assist the Court in sentencing.

Defendant pleaded guilty on January 23, 2011 to two counts
of bank robbery, under 18 U.S.C. §2113(a), committed on December
14 and 23, 2009.  His guideline, conventionally applied, would be
TOL 23 in CHC IV, so 70-87 months.  According to the presentence
report, he is a career offender with resulting guideline of 29 in
CHC VI, so 151-188 months.

Since the Sentencing Guidelines are no longer binding on the
Court, United States v. Booker, 125 S.Ct. 738 (2005), this Court
should impose a sentence that is "sufficient but not greater than
necessary" to achieve the four purposes of sentencing set forth
in section 3553(a)(2).  In so doing, the Court must use the
factors set forth in § 3553(a) to "make an individualized
assessment based on the facts presented."  Gall v. United States,
128 S.Ct. 586, 596 (2007).

1.  History And Characteristics Of Defendant

Mr. Taylor is 37, born to a 15-year-old girl who gave him up
for adoption.  In the first five months of life, he was placed

twice. once in a foster home aud once with his paternal grandfather.  After a Care and Protection petition, and a failed attempt by his natural parents to care for him, he was released for adoption to a couple who had several foster children.

Department of Social Services records describe an abusive and horrifying household.  A lengthy summary appears in the attached report of Dr. Bernice Kelley, dated January 15, 2006. Young Mr. Taylor, then 7, shared a bedroom with another foster child, Keith, age 6.  Keith had been tied to his bed, and was imploring Mr. Taylor to untie him.  Mr. Taylor tried to do so, but feared being discovered, and the boy died.  Police officers who responded to the scene described Keith as thin and undernourished with bruises on the back of the legs and buttocks that resembled cigarette burns, dried blood at the comer of the mouth and in one ear. The tiny bedroom he shared with Mr. Taylor was unlit, with a large hole in the door and a chain lock on the outside. The autopsy report indicated that Keith was starved, sick with a respiratory infection, beaten about the head (minimum of eight blows) and body and severely malnourished.. Multiple thrombi were seen in the lungs and a hemorrhage found in the brain.

That night, police removed six children from the home, including Mr. Taylor, and all were taken to Brockton Hospital, where the girls showed evidence of physica1 and sexual abuse.

-2-

Mr. Taylor was severely malnourished, with bilateral ear
infections, fresh bruises on the shins, old scars on his arms and
abdomen, and rashes.

Records indicate that the adoptive father had been born in
Ireland, had joined the British Airborne Division in 1942 at age
16 and was captured in 1944 by the German Army and remained a
Prisoner of War until 1946.  In prison, he was subjected to
starvation and torture. Apparently, he inflicted a similar
torture on his adoptive and foster children.  Both he and his
wife were found guilty of negligent homicide in the death of
young Keith.  Young Dennis testified against them.

The children were placed in other homes on an emergency
basis.  Young Dennis had difficulty adjusting.  A note taken by a
Social Service provider related a conversation a year later where
young Dennis described how he saw the couple tie Keith to the bed
and heat him.  In the dark room, Keith begged and pleaded with
Dennis to help him. Denis said that the room was dark and he
could not see to help Keith. He tried to untie the ropes but was
afraid. He expressed guilt and blamed himself for the death. H e
described himself as "bad", viewing himself as at fault.

During the years between 8 and 13, Taylor was in several
homes, exhibiting behaviors alternating between self-abusive and
self-defeating, and appearing desperate for attention.  At age
14, he was adopted a second time after appearing on "Wednesday's

-3-

Child," a program on the local CBS affiliate.  He had difficulty
adjusting to his new family, the Taylors, and found himself
placed in successive residential programs.

The devastating impact of past childhood trauma at the hands
of pathological parents impacted the course his development, as
well as affected his ability to adjust to the demands of
adulthood and to curb impulsive and self-defeating behaviors.  A
psychological evaluation performed when he was 13 years old
indicated a diagnosis of depression along with ADHD.  He had
three psychiatric hospitalizations during childhood, including
three months at New England Medical Center.  Later diagnoses
include Posttraumatic Stress Disorder (PTSD), mood disorder, and
ADHD.

His criminal record includes a variety of offenses including
shoplifting, assault. motor vehicle violations, and possession of
cocaine.  More serious charges include a robbery of a Carvel Ice
Cream Store in 1999 (at age 25) with a 4-6 year state sentence,
and a federal bank robbery charge in 2004 (age 31), with a 57
month sentence.  Many of the offenses involved impulsive and
unplanned criminal activity, unlikely to succeed and with the
obvious goal of getting cash for drugs.  The offense at issue
here, bank robbery with a note, is of a kind.  Note jobs, as they
are called, are almost always committed by drug addicts and
follow a predicable (and unsuccessful) course:  a quick payout

from a compliant teller followed by certain capture.  It is
without exception committed by addicts who might more
productively surrender at the local police station.  It is not to
demean the seriousness of the crime to say that perpetrators are,
as a group, drug addicted and mere days from capture.

It is also a population which would generally benefit from
intensive drug treatment with associated mental health services.
As too frequently happens, however, Taylor did not benefit from
services as underlying issue of untreated mental illness and
childhood trauma went unaddressed.  At his release in 2004, he
was given a single prescription of Ritalin from Shirley Medium
and was placed in a sober house.  The prescription ran out, and
he used drugs.  He was placed in the Shattuck Stabilization
Program, where the Ritalin prescription was beneficially
restored, and he completed the 90 day program, but the next
placement (Hope House) would not let him take medications, and
the same for the Answer House, which terminated him because he
was taking psychiatric medication.  Regrettably, the hallmark of
each placement was a failure of treatment of his underlying
issues, and, when off his medications, Taylor fell back to drug
use and robbed a bank for drug money, trying to escape the scene
in a cab when arrested, his clothes glowing in red dye.

During the service of his federal sentence, a psychiatrist
prescribed Ritalin.  As before, the positive benefit was a

substantial decrease in his restlessness and improvement in concentration and focus. After the conclusion of the federal sentence in 2009, he served a brief two month revocation sentence in state prison, where the medication was replaced with Welbutrin, and this treatment continued in Coolidge House, where he was placed since he had no residence at the time.  But the Welbutrin caused significant side effects, leaving him weak and physically ill.  He was maintaining a job, at a Back Bay hardware store from August to October, but he was frequently sick from the Welbutrin.  He explained this to his probation officer, and undertook to go to doctors at Boston City Hospital and at MGH to obtain a prescription for Ritalin.  At the MGH, he waited 6 hours only to be given an 800-number to call.  He could not control his restlessness, and could not maintain his concentration.  He was calling in sick to work, and was finally fired on Halloween.  To that point, he had a dirty urine, but not from use of cocaine but from Aderol, which he had obtained illegally to duplicate the effect of the Ritalin he sought.  Two days later, he misses a commuter train and could not get back to Coolidge House on time. He feared revocation, and days later began drug use.  These robberies, and his arrest followed.

Mr. Taylor has reflected on his failures, and recognizes that he cannot substitute illegal drugs to quell the racing thoughts, the panicked feelings that plague him when he is off

Ritalin.  Substituting cocaine creates its own desperation and
loss of judgment, and he is deeply aware of this.  His redemption
lies in his relationship to his girlfriend and to her children.
Mr. Taylor and Ms. Selan have known each other since 2001, and
have been in a relationship since 2009.  Ms. Selan cares for four
special needs children, three of whom she has adopted.  In an
interview with the Probation Officer, Ms. Selan said that Mr.
Taylor has an "outstanding relationship" with her children, that
he shows patience with them, and learned quickly how to relate to
and help them.  She expressed her wish to be married to Mr.
Taylor.  Mr. Taylor wishes to convey to the Court his deep
feelings for her children and for her.  For a man who has longed
for connection, for whom the hurt of the harms done to him as a
child have never left, it is the connection in marriage and the
love of family which will root him in the future.

2.  Defendant's Extraordinary Psychological Difficulites

The Sentencing Guidelines provide for downward departures
where "there exists ... [a] mitigating circumstance ... of a kind
or to a degree, not adequately taken into consideration by the
Sentencing Commission in formulating the guidelines that, in
order to advance the objectives set forth in 18 U.S.C.
§3553(a)(2), should result in a sentence different from that
described". U.S. Sentencing Guidelines §5K2.0 (Policy Statement).
In this case, the abuse suffered by Taylor was so "extraordinary"

that it "can be assumed to [have] caused mental or emotional pathology". <u>United States v. Rivera</u>, 192 F. 3d 81, 86 (2nd Cir. 1999).

A downward departure is warranted for such extraordinary childhood abuse and the profound challenges which burdened Mr. Taylor's development.  Compassion alone supports some consideration for his difficulties.

3.  Under § 3553, A Sentence Must Be "Sufficient, But Not <u>Greater Than Necessary" to Achieve a Fair Sentence.</u>

The Guidelines are not the sole factor that Congress has commanded the courts to apply in section 3553(a), even in the context of a career offender sentencing. <u>See</u> <u>e.g.</u>, <u>United States v. Martin</u>, 520 F.3d 87, 96 (1st Cir. 2008) (affirming sentence 91 months below career offender guideline, noting that sentencing court may "deviate from the guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission").

Departures in career offender cases have been "common country-wide," even under a mandatory-guideline regime.  <u>United States v. Ennis</u>, 468 F. Supp. 2d 228, 234 (D. Mass. 2006).  The Commission offers an explanation: sentences under the career offender guideline are among the most severe and least likely to promote sentencing purposes in the United States Sentencing Guidelines Manual. See USSC, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal

-8-

Justice System is Achieving the Goals of Sentencing Reform
("Fifteen Year Review") at 133-34 (2004).

As noted in <u>Martin</u>, courts have recognized that career
offender guidelines may conflict with the directive in
18 U.S.C. § 3553(a) for courts to impose a sentence "sufficient,
but not greater than necessary" to comply with the criteria set
forth in that statute.  See <u>United States v. Caraballo</u>, 447 F.3d
36 (1st Cir. 2006) (court affirms sentence below the career
offender advisory guideline range); <u>United States v. Moreland</u>,
437 F.3d 424, 436 (4th Cir. 2006) (court recognizes that
determination that sentencing [defendant] as career offender
might not comport with goals of § 3553(a) not unreasonable);
<u>United States v. Williams</u>, 435 F.3d 1350, 1353 (11th Cir. 2006)
(court sentences defendant to one-half career offender guideline
range, evaluating factors in § 3553(a) and concluding that career
offender guidelines too high, court of appeals affirms sentence
as reasonable).

Indeed, the guideline itself may be entitled to little
deference.  As the Supreme Court has recognized, where a
sentencing guideline does not reflect "empirical data and
national experience" and "do[es] not exemplify the Commission's
exercise of its characteristic institutional role," sentencing
courts are authorized to conclude that the guideline should not
apply, "even in a mine-run case."  <u>Kimbrough v. United States</u>,

552 U.S. 85, 128 S. Ct. 558, 574-75 (2007).  The career offender guideline, U.S.S.G. § 4B1.1, is just such a guideline: it does not rely on past practice and it has not been reviewed or revised to reflect empirical data and national experience.  See Amy Baron-Evans, Jennifer Niles Coffin, and Sara Noonan, Deconstructing the Career Offender Guideline (August 29, 2008), http://www.fd.org/odstb_SentDECON.htm.

When Congress first enacted the Sentencing Reform Act in 1984, it instructed the U.S. Sentencing Commission to base the Sentencing Guidelines on the purposes of sentencing listed in 18 U.S.C. § 3553(a)(2).  See 28 U.S.C. § 991(b).  But when the original Commissioners could not agree on how to weight the different statutory purposes, they decided to adopt an empirical approach that "used as a starting point data estimating pre-guidelines sentencing practice."U.S.S.G. Chapter One, Part A 1.3 ("The Basic Approach").  Since then, the Supreme Court has accepted this empirical approach as a fair approximation of the § 3553(a)(2) factors.  See Rita v. United States, 551 U.S. 338, 350 (2007).  Importantly, however, as the Court has correctly recognized, "not all of the Guidelines are tied to this empirical evidence."  Gall, 128 S.Ct. at 594 n.2.  Even when first promulgated, the career offender guideline did not reflect "empirical data and national experience" and did not "exemplify the Commission's exercise of its characteristic institutional

role." <u>Kimbrough</u>, 128 S.Ct. at 575.

As time went on, the career offender guideline widened its reach to a broader array of defendants and offenses far beyond what Congress originally intended.  More particularly, the best empirical evidence currently available suggests that, contrary to the parsimony provision in 18 U.S.C. § 3353(a), the career guideline offender guideline frequently results in sentences "greater than necessary" to achieve the goals of sentencing. <u>See</u>, <u>id</u>. at 32-39.

Of particular note here, the recidivism rate of those whose career offender status was based on one or more prior "crimes of violence" was about 52%. See Fifteen Year Review at n.1, 134. Only 12.5% of such persons, however, were charged with a "serious violent offense," defined as homicide, kidnaping, robbery, sexual assault, aggravated assault, domestic violence, and weapons offenses, and only 4.1% were drug trafficking.  See USSC, <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u> at 32, available at <u>http://www.ussc.gov/publicat/Recidivism_General.pdf103.</u>  The largest proportion of recidivating events (38.3%) were probation or supervised release revocations, <u>id</u>., which can be anything from failing a drug test to failing to appear at a probation office's request.

Enormous sentences are imposed on persons whose recidivism rates for significant crimes are modest and whose problems generally relate to taming their drug issues.

4.  The Career Offender Guideline Overstates Mr. Taylor's Likely Recidivism.

The Court is required to compute the Guideline Sentencing Range ("GSR") as a "starting point and the initial benchmark." Gall v. United States, 128 S.Ct. 586, 596 (2007).  Taylor faces sentencing as a career offender with a possible term of 12 ½ to 15 years.

Designating defendant as a career offender significantly over-represents the likelihood that he will commit further crimes after his release from incarceration.  This can be shown either through the circumstances of a particular defendant's criminal history, see United States v. Collins, 122 F.3d 1297 (10th Cir. 1997), or that the future risk that a particular offender will recidivate is low, see United States v. Lawrence, 916 F.2d 553 (9th Cir. 1990).  See United States v. Woodley, 344 F.Supp.2d 274 (D.Mass. 2004).

Important prognostic indicators for Mr. Taylor include that his history of criminal offenses relates to his psychological and substance abuse disorders for which treatment is available, and that he is committed to his family and plans to marry his girlfriend, taking responsibility for her children.

In these circumstances, the court can depart to reflect the

reduced likelihood of recidivism should defendant receive treatment for both his substance abuse treatment and his underlying psychological issues.  Perhaps the hallmark case is this Court's resolution in United States v. Daniel DiPascale, CR. NO. 99-10083-GAO.  Mr. DiPascale had made many prior efforts to seek treatment for his addiction, several times voluntarily entering detox programs but he never succeeded in aftercare.  It would have been easy for this Court simply to impose a career offender sentence as Mr. DiPascale's likelihood of freeing himself of a life-long heroin habit was negligible. Notwithstanding the difficulties, this Court sentenced Mr. DiPascale to 84 months and years later witnessed Mr. DiPascale completing the CARE Program successfully.

In numerous cases in this District, courts have departed from career offender sentences.  See United States v. Woodley, 344 F.Supp.2d 274 (D.Mass. 2004) (in a bank robbery case, court imposed 84 months due to overstatement of criminal history and extraordinary rehabilitation); United States v. David Glavin, Criminal No. 04-10093-MLW (in a bank robbery case, court departed from 151-188 guideline to 86 months where defendant grew up under particularly miserable circumstances thus developed heroin addiction and where the steady history of crimes which led to career offender status are the kinds of offenses typically associated with addicts who need to feed a drug habit); United

<u>States v. Politis</u>, Criminal No. 08-10180-MLW (in a bank robbery case, departure from career offender to 84 months, since "Defendant's many bank robberies were non-violent and driven by his drug addiction. He showed extraordinary acceptance of responsibility by confessing to nine bank robberies of which the government was unaware. Defendant is now dedicated to getting effective treatment for his powerful addiction, which will reduce the risk of recidivism."); <u>United States v. Barrett</u>, Criminal No. 01-10450-PBS (on a charge of bank robbery, with a guideline of 151-188 months, the court imposed 84 months ruling "The government did not oppose the motion for downward departure based on a combination of factors, including extraordinary physical impairments and post-offense, pre-arrest rehabilitation."); <u>United States v. Stephen Wright</u>, Criminal No. 97-10287-EFH (July 30, 1998) (on charge of unarmed bank robbery with guideline range of 151-188 months, sentenced to 46 months on ground that defendant's criminal history category significantly over-represented the seriousness of the defendant's criminal history and the likelihood that the defendant would commit further crimes); <u>United States v. Beverly</u>, Criminal No. 03-10042-MLW (in a bank robbery case, reduction to 120 months sentence for overstatement of criminal history: "...a departure to the range that would have existed if the defendant was not a career offender was most appropriate."); <u>United States v. Trent</u>

Miller, Criminal No. 06-10291-JLT (in a repeat-offense bank
robbery, court after trial imposed 87 months for a defendant who
lacked the mitigating history of abuse and drug addiction, and
who was not entitled to adjustment for acceptance of
responsibility); United States v. Kevin McGrath, Criminal No.
98-10302-MLW (May 2, 2000) (on charge of unarmed bank robbery
with guideline range of 151-188 months, defendant sentenced to
108 months on ground that "Defendant's Criminal History
significantly over represents the likelihood the defendant will
commit crimes in the future"); United States v. Edward Brady,
Criminal No. 99-10425-RWZ (September 12, 2000) (same); United
States v. Joseph Burhoe, Criminal No. 01-CR 10464-RCL (in bank
robbery case departing from 151-188 guideline to 77 months where
sentence was "sufficiently lengthy to serve as a deterrent to
this defendant and others" and there was "documented
psychological scarring as a consequence of years of childhood...
abuse"); United States v. David Laperle, Criminal No.
00-10021-MLW (October 17, 2001) (departing from 151-188 month
range in career offender bank robbery case to 84 months based on
finding that career offender status "significantly

overrepresented the risk of recidivism if he receives the

treatment prescribed by this sentence").

                              DENIS TAYLOR
                              By his attorney,

                              /s/ Charles P. McGinty

                              Charles P. McGinty
                                B.B.O. #333480
                              Federal Defender Office
                              51 Sleeper Street, 5th Floor
                              Boston, MA  02210
                              Tel: 617-223-8061

                    <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this document, filed through the ECF
system, will be sent electronically to the registered
participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-
registered participants on May 9, 2011.

                              /s/ Charles P. McGinty
                              Charles P. McGinty